IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

RECEIVED
USDC, CLERK, CHARLESTON, SC

2014 NOV 17  A 9: 40

| | |
|---|---|
| Willie Joe Sturkey, ) | Civil Action No. 2:13-cv-3451-RMG |
| ) | |
| Plaintiff, ) | |
| ) | **ORDER** |
| vs. ) | |
| ) | |
| Bryan P. Stirling, Director, SCDC; Juanita ) | |
| Gatson, Regional Director of ) | |
| Classification, SCDC; and Wanda Buoy, ) | |
| Lieutenant, RCI, *in their individual* ) | |
| *capacity, in their official capacity*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

This matter is before the Court on the Report and Recommendation (R & R) of the Magistrate Judge, (Dkt. No. 55), recommending this Court grant Defendants' motion for summary judgment. (Dkt. No. 35-1.) Plaintiff filed a timely objection. (Dkt. No. 62.) As explained herein, the Court ADOPTS the R & R in part, grants summary judgment on Plaintiff's federal claims, and dismisses Plaintiff's pendant state motion without prejudice.

## I.    Factual Background and Procedural History

### A.    Factual Background

Plaintiff, a prisoner at Lee Correctional Institution, filed this civil action *pro se* on December 11, 2013. (Dkt. No. 1.) Plaintiff alleges a deliberate indifference claim under 42 U.S.C. § 1983 and gross negligence under state tort law occurring during his incarceration at Ridgeland Correctional Institution (RCI) in Ridgeland, South Carolina.[1] (*Id.*) Plaintiff amended

---

[1] In addition to his deliberate indifference claim under the Eighth Amendment, Plaintiff asserts violations of due process and equal protection under the Fourteenth Amendment. (Dkt. No. 22-2 at 5.) However, he does not allege a deprivation of any liberty interest or that he was treated differently from others similarly situated. Therefore, the Court will not address these claims.

1

his Complaint on February 11, 2014, and seeks a declaratory judgment[2] and monetary damages in the amount of $ 300,000 dollars. (Dkt. No. 22-2 at 6.)

Plaintiff alleges that his "serious medical conditions" of chest pain, high blood pressure, and high cholesterol require, pursuant to his medical classification, that he be placed in a bottom bunk of the ground floor in any cell assignment. (Dkt. No. 22-2 at 4.) He alleges that Defendant Wanda Buoy, a Lieutenant at RCI, refused to comply with this requirement, thereby delaying his medical treatment. (Dkt. No. 22-2 at 5.) Plaintiff has provided his medical classification and cell assignment forms, which restrict Plaintiff's cell assignment to a bottom bunk on the ground floor. (Dkt. No. 51-2 at 6, 7.) The medical classification form was entered on October 22, 2010, and the cell assignment form is dated December 6, 2011, six months prior to when Plaintiff alleges he first informed Defendant Buoy of his cell assignment restrictions. (Dkt. Nos. 51-2 at 6, 7, 22-2 at 4.)

In her affidavit, Defendant Buoy attests that Plaintiff was transferred to RCI on or about March 19, 2012, and was first assigned to the Savannah Dorm. (Dkt. No. 35-4 at 2.) According to Plaintiff's medical records, on May 14, 2012, Plaintiff was transferred to the Charleston Dorm for security reasons. (Dkt. No. 35-7 at 5.) The medical records indicate that he protested this assignment because there were members of the "Bloods" gang at the Charleston Dorm, and he

---

*See Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) ("To succeed on a procedural due process claim, a plaintiff must . . . first . . . demonstrate that he had a constitutionally cognizable life, liberty, or property interest."); *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) ("To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.").

[2] The Court notes that, because Plaintiff is no longer incarcerated at RCI [*See* http://public.doc.state.sc.us/scdc-public/, showing that Plaintiff is now housed at Lee Correctional Institution)], his claim for declaratory relief is moot. *See Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 248–49 (4th Cir. 2005) (holding former detainee's request for injunctive relief was moot).

felt threatened by them. (*Id.*) Plaintiff was assured that he would be safe because the Charleston Dorm was on a lockdown, and was assigned to a top bunk on the second floor. (*Id.*) According to the South Carolina Department of Corrections' (SCDC) response to Plaintiff's grievance, there was no available bed space on the ground floor when Plaintiff was first transferred. (Dkt. No. 1-1 at 1.)

Plaintiff alleges that when he was assigned to the Charleston Dorm on or about May 10, 2012, he informed Defendant Buoy that he had a medical condition that required he be assigned to a bottom bunk on the bottom floor. (Dkt. No. 22-2 at 4.) He alleges that Defendant Bouy responded that she did "not provide special privileges to thieves" and ignored his continued requests to be moved. (*Id.*) Defendant Buoy denies these allegations in her affidavit, and claims that she had no knowledge of Plaintiff's medical condition and cell assignment. (Dkt. No. 35-4 at 2.) She states that she knew only that Plaintiff took medication. (*Id.*) She further explains that she has no role in making classification decisions or moving an inmate for security reasons. (*Id.* at 1.)

Plaintiff alleges that Defendant Buoy threatened to move him to a disciplinary unit if he continued to complain. (Dkt. 22-2 at 4.) Plaintiff further alleges that, in response to this threat, he made an appointment with "the Doctor, who immediately sent a message to" Defendant Buoy on June 7, 2012, to move him according to his medical classification. (*Id.*) The June 7, 2012 medical encounter note referenced by Plaintiff states, "Please contact security about transferring to another building. Has to remain on daily nursing for now. Cannot change classification." (Dkt. No. 51-2 at 11.) There is no mention of any restriction to a bottom bunk on the ground floor. (*Id.*) Further, there is no evidence that this request for Plaintiff to be moved to another

3

building was actually ever transmitted to Defendant Buoy or received by her, and Defendant Buoy denies receiving any such request. (Dkt. No. 35-4 at 2.)

The medical records indicate that Plaintiff received daily nursing while incarcerated at RCI, and that his blood pressure was closely monitored by medical staff. (Dkt. Nos. 35-7 at 2-5, 51-2 at 16.) On April 25, 2012, prior to his transfer to the Charleston Dorm, Plaintiff's blood pressure was recorded as 190/130 mm Hg. (Dkt. No. 51-2 at 11.) According to the medical records, Plaintiff's blood pressure did not rise above this level at any time between May 10, 2012, and June 11, 2012, the period of Plaintiff's alleged delay in medical treatment. (Dkt. No. 35-7 at 2-5.)

At times during his assignment to the Charleston Dorm, Plaintiff refused to take his medication and told medical staff that the medication was unnecessary. (Dkt. No. 35-7 at 4-5.) According to the affidavit of one of Plaintiff's nurses, Chris Lloyd, RN,[3] on May 23, 2012, Plaintiff "had voluntarily discontinued his medications" in an attempt to "have his medical classification downgraded so that he could be transferred to a lower security institution." (Dkt. No. 38 at 2.) However, as Nurse Lloyd attested, "only the institutional physician can change an inmate's medical classification." (*Id.*) On June 1, 2012, Plaintiff told a nurse, "I want to get off all my meds. I do not feel I need (sic) and do not think there is anything wrong with my heart." (Dkt. No. 35-7 at 4.) The nurse's documented notes state that she "found the real reason he wanted to get off his meds was his med class and [he] wanted it changed." (*Id.*) There is no evidence submitted that Plaintiff's cell assignment at the Charleston Dorm motivated his requests to change his medical classification, nor is it clear that a change in his medical classification would have ensured his assignment to a bottom bunk on the ground floor.

---

[3] Nurse Lloyd is not a defendant in this case.

4

According to the SCDC's response to Plaintiff's grievance and subsequent request to staff, once bed space became available in the Charleston Dorm, Plaintiff was assigned to a bottom bunk on the ground floor. (Dkt. Nos. 1-1 at 1, 35-4 at 2, 35-9 at 2.) On June 11, 2012, the day that Plaintiff was reassigned, Plaintiff was moving his property from the second floor to his new cell on the ground floor, when he became dizzy, and slipped and fell down the stairs. (Dkt. Nos. 22-2 at 5, 35-7 at 2, 38 at 2.) Plaintiff alleges that he injured his back when he fell. (Dkt. No. 22-2 at 5.) Plaintiff sought treatment from Nurse Lloyd immediately after his fall. (Dkt. No. 38 at 2.) According to the medical records, Plaintiff told Nurse Lloyd that "he just pulled his back a little," and that he "was dizzy, but better now." (Dkt. Nos. 35-7 at 2, 38 at 2.) In his affidavit, Nurse Lloyd attests that Plaintiff "denied having fallen onto his back or hitting anything as a result of the fall." (*Id.*) The medical records and Nurse Lloyd's affidavit state that, on the day of Plaintiff's fall, he was not in distress, his range of motion was within normal limits, and there was no swelling or discoloration on his back. (Dkt. Nos. 38 at 2, 4, 35-7 at 2.) Plaintiff has not produced any evidence of lasting detrimental effects from his fall on June 11, 2012.

On June 12, 2012, after Plaintiff had been moved to a bottom bunk on the ground floor, Plaintiff submitted a grievance claiming that Defendant Buoy's failure to initially place him "according to [his] health summary . . . was the proximate cause of [his] back injury." (Dkt. No. 1-1 at 2.) The SCDC's response to Plaintiff's grievance and subsequent request to SCDC staff stated that, because Plaintiff had been moved to a bottom bunk on the ground floor of the Charleston Dorm on June 11, 2012, his grievance had been addressed and resolved. (Dkt. Nos. 1 at 1, 35-9 at 2.) Plaintiff, however, does not agree that his grievance was properly addressed and alleges that Defendant Jaunita Gaston, the Regional Director of Classification at the SCDC,

5

"failed to correct the issue with corrective action upon Lt. Buoy." (Dkt. No. 22-2 at 5.) He further alleges that Defendant Bryan P. Stirling, the current SCDC Director, did not properly supervise, manage, and control his staff.[4] (Dkt. No. 1 at 5.) Plaintiff alleges that all Defendants were deliberately indifferent to his serious medical needs and grossly negligent in their failure to provide proper medical care and treatment. (*Id.*) He has sued Defendants in their individual and official capacities. (Dkt. No. 22-2 at 3.)

### B.     Procedural History

Pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC, this case was referred to a United States Magistrate Judge for all pretrial proceedings. On April 30, 2013, Defendants filed a motion to dismiss, or in the alternative, for summary judgment. (Dkt. No. 35). After receiving an extension of time, Plaintiff filed a response on July 7, 2014. (Dkt. No. 51.) On September 8, 2014, the Magistrate Judge issued a Report and Recommendation ("R & R") recommending that Defendants' motion for summary judgment be granted and this case dismissed. (Dkt. No. 55.) Specifically, the Magistrate Judge found that: (1) Plaintiff has failed to exhaust his administrative remedies prior to filing this suit against Defendants SCDC Director and Gatson; (2) Plaintiff's 42 U.S.C. § 1983 claims against Defendants in their official capacities are barred pursuant to Eleventh Amendment Immunity; (3) there is no evidence to support Plaintiff's claims of supervisory liability against Defendant SCDC Director in his individual capacity; (4) there is no evidence that Defendants were deliberately indifferent to any serious medical need of the Plaintiff; (5) Defendants are entitled to qualified immunity; and (6)

---

[4] Although Plaintiff names Director Stirling as a defendant, (Dkt. No. 22-2 at 2), he was not an employee of SCDC at the time of Plaintiff's injury, and did not become Director until his appointment by the Governor on October 1, 2013. At all times Plaintiff was incarcerated at RCI, the SCDC Director was the Honorable William R. Byars, Jr.. To avoid confusion, the Court will refer to Defendant Stirling as Defendant SCDC Director.

Defendants are entitled to summary judgment as to Plaintiff's State law tort claims of gross negligence. Plaintiff timely submitted his objections to the R&R, objecting to each of these findings. (Dkt. No. 62.)

## II.    Legal Standard

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270–71, 96 S. Ct. 549, 46 L.Ed.2d 483 (1976). Thus, this Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court may also "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Defendants move to dismiss or, in the alternative, for summary judgment. The Court will evaluate this motion under the summary judgment standard.[5] Summary judgment is appropriate if a party "shows there is no genuine dispute as to any issue of material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Under the framework established in *Celotex Corporation v. Catrett*, the party seeking summary judgment shoulders the initial burden of demonstrating to the Court that there is no genuine issue of material fact. 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party makes this threshold demonstration, then the non-moving party must, in order to survive summary judgment, demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* Notably, "[i]n this Circuit, verified complaints by *pro se* prisoners are to be considered as affidavits and may,

---

[5] If, on a motion to dismiss, a court considers matters outside of the pleadings, such as a party's supporting memoranda and attachments, then the court treats that motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d). In this case, the Court will consider, *inter alia*, medical records and affidavits submitted by the parties. Accordingly, it will evaluate Defendants' entire motion under the summary judgment standard.

standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge." *Pendergrass v. United States*, No. 0:11–cv–2706–PMD, 2013 WL 518842, at *1 n.3 (D.S.C. Feb.12, 2013) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

In reviewing these pleadings, the Court is mindful of Plaintiff's *pro se* status. This Court is charged with liberally construing the pleadings of a pro se litigant. *See, e.g., De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). The requirement of a liberal construction does not mean, however, that the Court can ignore a pro se plaintiff's clear failure to allege facts that set forth a cognizable claim, or that a court must assume the existence of a genuine issue of material fact where none exists. *See United States v. Wilson*, 699 F.3d 789, 797 (4th Cir. 2012).

### III. Discussion

#### A. Exhaustion of Administrative Remedies

The Court disagrees with the Magistrate Judge's finding that Plaintiff's failure to specifically mention Defendant SCDC Director and Defendant Gatson in his grievance is grounds for summary judgment as to his claims against them. The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court and the Fourth Circuit Court of Appeals recently addressed "the issue of whether prison grievances must name particular defendants in order to satisfy the PLRA's exhaustion requirements as against those defendants." *Moore v. Bennette*, 517 F.3d 717, 726 (4th Cir. 2008). In *Jones v. Bock*, the Supreme Court found that "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances." 549

U.S. 199, 219, 127 S. Ct. 910, 923, 166 L. Ed. 2d 798 (2007). Rather, as the Court held, the PLRA requires only "[c]ompliance with prison grievance procedures" to exhaust administrative remedies. *Id.* In light of *Jones*, the Fourth Circuit Court of Appeals held in *Moore v. Bennette* that the plaintiff did not have to identify specific individuals in his grievances where such identification was not required by the prison's grievance procedures. 517 F.3d at 717.

Here, nothing in the SCDC's policies and procedures required Plaintiff to identify specific individuals in his grievance. *See* SCDC Policy GA-01.12 (Inmate Grievance System). Therefore, because Defendants allege no other deficiency as to Plaintiff's exhaustion of administrative remedies, summary judgment is not proper on this ground.

### B. Deliberate Indifference

However, the Court agrees with the Magistrate Judge that Plaintiff did not carry his burden of demonstrating there is an issue of material fact as to his deliberate indifference claim. *See Celotex Corp.*, 477 U.S. at 323. In order for a prisoner to state a cognizable claim, the "prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L.Ed.2d 251 (1976). A prisoner alleging deliberate indifference must meet a very high standard. *Parrish v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004). In *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), the Fourth Circuit Court of Appeals noted that treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness, nevertheless, mere negligence or malpractice does not violate the Eighth Amendment." To be deliberately indifferent, a prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Where the alleged Eighth Amendment violation involves a delay in medical or surgical treatment, a violation occurs only "if the delay results in some substantial harm to the patient." *Webb v. Hamidullah*, 281 Fed. Appx. 159, 166 (4th Cir. 2008) (unpublished). "Substantial harm" can be demonstrated by the "marked" worsening of the inmate's condition during the delay in treatment, "frequent complaints of severe pain", or the progression of the condition during the period of delay so that it is now untreatable. *Id.* at 167.

In his Amended Complaint, Plaintiff alleges that Defendant Bouy knew that Plaintiff had been assigned to a cell that was not in accord with his medical classification. (Dkt. No. 22-2 at 4.) Specifically, Plaintiff alleges that when he was transferred to the Charleston Dorm "on or about May 10, 2012," he informed Defendant Bouy that he had a medical condition "that requires for [him] to be assigned on the bottom floor/bottom bunk." (*Id.*) He further alleges that he "continued to complain and request to be moved to the bottom floor and bottom bunk, but was disregarded by Lt. Buoy." (*Id.*) In her affidavit, Defendant Buoy claims that she was never advised by anyone, including Plaintiff, "that he could not be placed in a second floor cell or that he could only sleep in a bottom bunk." (Dkt. No. 35-4 at 2.) However, because Plaintiff's allegations in his verified Amended Complaint are considered an affidavit, *Pendergrass*, 2013 WL 518842, at *1 n.3, Plaintiff has provided sufficient evidence that, viewed in the light most favorable to the Plaintiff, Defendant Buoy did in fact know of the requirements of Plaintiff's cell assignment.

Although Defendant Buoy may have had such knowledge, it appears she would not have been able to move Plaintiff to a different cell prior to June 11, 2012. According to the SCDC's response to Plaintiff's grievance and subsequent request to staff, this is when bed space that met the requirements of Plaintiff's medical classification first became available. (Dkt. Nos. 1-1 at 1, 35-4 at 2, 35-9 at 2.) Plaintiff has not presented any evidence that there was bed space available in the Charleston Dorm that met his medical classification prior to this date. Furthermore, there is no evidence submitted that Defendant Buoy interfered with Plaintiff's medical treatment in any way beyond the alleged failure to move him to a different cell. The medical records reflect that Plaintiff received regular medical care for his chronic high blood pressure throughout his temporary cell assignment. (Dkt. No. 35-7 at 2-5.)

Plaintiff's own statements as documented in the medical records indicate that any issues he had with his medical treatment during the period at issue were independent of his cell assignment. Specifically, the medical records document Plaintiff's attempts to minimize his medical condition and change his medical classification. (Dkt. No. 35-7 at 2-4.) According to Nurse Lloyd's affidavit, Plaintiff wanted to be moved to a lower security institution, which could occur if he received a lower medical classification. (Dkt. No. 38 at 2.) On June 1, 2012, Plaintiff reported to a nurse that he did not think there was anything wrong with his heart, and therefore, he did not need any medication. (Dkt. No. 35-7 at 4.) This nurse noted that "the real reason" Plaintiff wanted to stop taking his medication was to change his medical classification. (*Id.*) In Plaintiff's numerous attempts to change his medical classification, he never mentioned any issues with his cell assignment. Rather, his concerns focused on completely changing institutions, not just his dorm, as a result of a change in his medical classification. (Dkt. No. 35-

7 at 3.) Plaintiff continued to request a change in his medical classification after he had been moved to a bottom bunk on the ground floor of the Charleston Dorm. (Dkt. No. 35-7 at 2.)

The foregoing evidence, viewed in the light most favorable to the Plaintiff, indicates that Defendant Buoy's conduct, at most, amounts to mere negligence, which, without more, does not constitute deliberate indifference. *See Miltier*, 896 F.2d at 851 ("noting that medical treatment "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness, . . . nevertheless, mere negligence or malpractice does not violate the Eighth Amendment.") (citations omitted).

Furthermore, Plaintiff's allegations, at most, amount to a delay in medical treatment for his serious medical condition of chronic high blood pressure. Plaintiff alleges that his assignment to a bottom bunk on the ground floor, as designated in his medical classification form, was part of his medical treatment. (Dkt. No. 22-2 at 3-5.) He further alleges that Defendant Buoy's refusal to assign Plaintiff to a cell according to his medical classification delayed his medical treatment and caused him to fall and injure his back on June 11, 2012. (Dkt. No. 22-2 at 5.) Plaintiff's medical records state that Plaintiff was originally moved to the Charleston Dorm for security reasons on May 14, 2012, and Plaintiff strongly protested this transfer out of fear of gang related violence. (Dkt. No. 35-7 at 5.) Plaintiff alleges he was transferred to the Charleston Dorm on or about May 10, 2012. (Dkt. No. 22-2 at 4.) The SCDC's response to Plaintiff's request to staff states that he was not originally placed in a bottom bunk on the ground floor of the Charleston Dorm because there was no such available bed space. (Dkt. No. 35-9 at 2.) This response states that, as soon as bed space became available, Plaintiff was moved to "the ground floor, bottom bunk # 23-B." (*Id.*) On June 11, 2012, Plaintiff fell and injured his back in the process of moving into his new cell. (Dkt. Nos.

22-2 at 5, 35-4 at 2.) Accordingly, viewing the evidence in the light most favorable to the Plaintiff, Plaintiff was in a top bunk on the second floor of the Charleston Dorm for one month, from May 10, 2012 to June 11, 2012. Throughout this period, Plaintiff received daily nursing care, as his medical classification required. (Dkts. No. 35-7 at 2-5, 51-2 at 7.)

Where the Eighth Amendment claim involves a delay but not a denial of medical care, the plaintiff must show "some substantial harm." *Webb*, 281 Fed. Appx. at 166. Here, Plaintiff has failed to present any evidence that he suffered a "substantial harm" as a result of the delay in his assignment to a bottom bunk on the ground floor of the Charleston Dorm. *Webb*, 281 Fed. Appx. at 166.

Viewed in the light most favorable to the Plaintiff, there is no evidence that Plaintiff's medical condition worsened while he was temporarily housed on the second floor of the Charleston Dorm. *Id.* at 167. The medical record reflects that Plaintiff's blood pressure was no worse during his temporary cell assignment than it had been when he was assigned to a bottom bunk on the ground floor. (Dkt. No. 35-7 at 2-5.) Specifically, on April 25, 2012 and May 11, 2012, Plaintiff's blood pressure was recorded as 190/130 mm Hg and 140/90 mm Hg, respectively. (*Id.* at 3, 5.) The medical record indicates that Plaintiff's blood pressure did not rise above 190/130 mm Hg at any time following his transfer to the Charleston Dorm on or about May 10, 2012. (*Id.* at 2-5.) In fact, Plaintiff's blood pressure was recorded as significantly lower at times during his assignment to the second floor of the Charleston Dorm. (Dkt. No. 35-7 at 2-5.) In addition, Plaintiff did not report any chest pain while he was temporarily housed on the second floor.

Similarly, Plaintiff has not presented any evidence that his back injury resulted in a marked worsening of his medical condition or a progression of his condition so that it is no

13

longer treatable. *Webb*, 281 Fed. Appx. at 167. Plaintiff received medical treatment immediately after his fall on June 11, 2012, and is reported to have told the nurse that "I did not hit anything, just pulled my back a little, was dizzy but better now." (Dkt. No. 35-7 at 2.) The medical record indicates that Plaintiff was not in distress, his range of motion was within normal limits, and there was no swelling or discoloration on his back. (Dkt. Nos. 35-7 at 2, 38 at 2, 4.) Plaintiff has not presented evidence that he has suffered any lasting effects from this incident. Moreover, as the Magistrate Judge aptly noted, there is nothing in the medical record to indicate that Plaintiff's fall on June 11, 2012, was caused or contributed to in any manner whatsoever by his temporary cell assignment. (Dkt. No. 55 at 12.) *See Martinez v. Powers*, 2009 WL 2513480, at *4 (D.S.C. Aug. 13, 2009) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994)) ("[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.").

Having found that Defendant Buoy's conduct constituted, at most, mere negligence, and that Plaintiff suffered no "substantial harm" as a result of the delay in his assignment to a bottom bunk on the ground floor, the Court concludes that Plaintiff cannot establish an Eighth Amendment claim for deliberate indifference to serious medical needs.[6] Accordingly, Plaintiff's claim against Defendant Director SCDC under a theory supervisory liability also fails as a matter of law. Because there is no doctrine of respondeat superior in § 1983 claims, *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691–94, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978), a defendant is liable in his individual capacity only for his personal wrongdoing or supervisory

---

[6] Because Plaintiff has failed to establish a violation of his constitutional rights, the Court does not address the Magistrate Judge's findings regarding Defendants' immunity pursuant to the qualified immunity doctrine and the Eleventh Amendment. (Dkt. No. 55 at 7-8, 13-14.)

actions that violated constitutional norms, *see Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (setting forth elements necessary to establish supervisory liability under § 1983). A plaintiff must establish three elements to prevail under § 1983 on a theory of supervisory liability:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices[ ]"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* (citations omitted); *see also Jones v. Corr. Care Solutions*, No. 0:09–cv–269, 2010 WL 2639788, at *2 (D.S.C. June 7, 2010) (noting that, under *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), supervisory liability may no longer be a viable § 1983 claim).

Here, Plaintiff has failed to demonstrate sufficient facts to establish any of the three necessary parts of a supervisory liability claim. First, Plaintiff failed to show Defendant SCDC Director had actual or constructive knowledge of a pervasive risk of harm to Plaintiff's rights. As discussed above, Plaintiff has failed to establish that his constitutional rights were violated; therefore, there was no pervasive risk of harm of which Defendant SCDC Director should have been aware. Second, Plaintiff has failed to show Defendant SCDC Director acted with deliberate indifference with respect to Plaintiff's medical needs. Finally, Plaintiff has failed to establish a causal link between any inaction on the part of Defendant SCDC Director and the alleged violation of Plaintiff's constitutional rights because Plaintiff failed to demonstrate Defendant SCDC Director's subordinates were deliberately indifferent to Plaintiff's medical needs. Therefore, Plaintiff has failed to state a claim under a theory of supervisory liability.

### C.     State Law Claims

Having adopted the Magistrate's recommendations with respect to Plaintiff's federal claim of deliberate indifference, the only claims remaining are the pendant state law claims for gross negligence. A federal court has discretion to decide pendant state law claims if federal and state claims arise out of a common nucleus of operative facts; however, if the federal claims are dismissed before trial, the state claims are normally dismissed as well. 28 U.S.C. 1367(c); *e.g.*, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Webb v. McCullough*, 828 F.2d 1151, 1150 (6th Cir. 1987). Therefore, Plaintiff's claims arising under state law are dismissed without prejudice.

### IV.     Conclusion

The Court declines to adopt the portion of the R & R that finds Plaintiff failed to exhaust his administrative remedies. The Court **ADOPTS** the portion of the R & R that finds Defendants are entitled to summary judgment on Plaintiff's federal claim of deliberate indifference. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment (Dkt. No. 35-1) as to Plaintiff's federal claim of deliberate indifference, and dismisses Plaintiff's pendant state law claims without prejudice.

**IT IS SO ORDERED.**

_____
Richard M. Gergel
United States District Judge

November 17, 2014
Charleston, South Carolina